IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br> Plaintiff, <br><br> v. <br><br> **ABRAHAM NELSON-BRENES,** <br> Defendant. | CRIM. NO. 21-079 (DRD-MDM) |

## ORDER

Pending before the Court is defendant's "Motion for Leave to Request Appointment of a Psychiatric Expert to Assist Mr. Nelson Brenes" ("Motion to Appoint a Psychiatric Expert"). Docket No. 124. In his Motion to Appoint a Psychiatric Expert, the defendant requests leave of the Court to appoint Dr. Raúl López, M.D. to testify generally about post-traumatic stress disorder ("PTSD") and to conduct an independent examination of the defendant "with respect to [his] specific conditions." *Id.* The defendant also proffers that Dr. López will "offer an opinion about other issues related to PTSD, including [whether] Mr. Nelson Brenes ha[s] a reasonable documented history and current symptoms to justify a diagnosis of PTSD according to DSM-5 criteria." *Id.* Then, if Mr. Nelson Brenes is found to suffer from PTSD, the defendant proposes that Dr. López offer his opinion as to what effect, if any, PTSD has on defendant's "emotional stability and state of mind to make a rational and intelligent decision to make a statement after being read his rights." *Id.* Dr. López will also opine on the manifestations of PTSD; whether it impairs the defendant; and what effect, if any, it has on his personality (making him aggressive or passive). *Id.*

The government, on the other hand, argues that according to the Supreme Court's decision in *Colorado v. Connelly*, 479 U.S. 157 (1986), "the

Case 3:21-cr-00079-DRD-MDM   Document 153   Filed 07/29/22   Page 2 of 9

*United States v. Abraham Nelson Brenes*,                                                                Page 2
Crim. No. 21-079 (DRD-MDM)

defendant's psychological makeup does not bear on the voluntariness of his waiver of *Miranda* in the absence of police coercion, and because the record in this case demonstrates that law enforcement had no knowledge that the defendant suffered from PTSD, there can be no finding that law enforcement took advantage of that condition and somehow coerced the defendant into making inculpatory statements against his will. The Court agrees with the position of the government and, for the reasons espoused more thoroughly below, **DENIES** the defendant's Motion to Appoint a Psychiatric Expert. The Court explains.

In *Colorado v. Connelly*, 479 U.S. at 164, the Supreme Court was faced with the issue of whether a defendant's mental health condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional *voluntariness*. After an exhaustive analysis of the Due Process Clause of the Fourteenth Amendment, the Court answered that question in the negative. *Id.* at 167.

In *Connelly*, police officer Patrick Anderson of the Denver Police Department found himself working one day[1] in uniform in an off-duty capacity in downtown Denver, Colorado. *Connelly*, at 160. The defendant, Francis Connelly, approached Officer Anderson and, without any prompting, stated that he had murdered someone and wanted to talk about it. *Id.* Officer Anderson immediately advised Connelly that he had the right to remain silent, that anything he said could be used against him in court, and that he had the right to an attorney prior to any police questioning. *Id.* (citing, *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)). Connelly stated that he understood those rights, but he still wanted to talk about the murder. *Id.* Understandably bewildered by this confession, Officer Anderson asked Connelly several questions. In response, Connelly denied that he had been drinking, denied that he had been taking any drugs, and stated

---

[1] The actual date was August 18, 1983.

Case 3:21-cr-00079-DRD-MDM   Document 153   Filed 07/29/22   Page 3 of 9

*United States v. Abraham Nelson Brenes*,                                                                Page 3
Crim. No. 21-079 (DRD-MDM)
_____

that, in the past, he had been a patient in several mental hospitals. Officer Anderson again told Connelly that he was under no obligation to say anything. Connelly replied that it was "all right," and agreed to talk to Officer Anderson because his conscience had been bothering him. *Id.* To Officer Anderson, Connelly appeared to fully understand the nature of his acts. *Id.*

Shortly thereafter, Homicide Detective Stephen Antuna arrived. Connelly was again advised of his rights, and Detective Antuna asked him "what he had on his mind." *Id.* Connelly answered that he had come all the way from Boston to confess to the murder of Mary Ann Junta, a young girl whom he had killed in Denver sometime in November of the previous year.[2] *Id.* Connelly was taken to police headquarters, and a search of police records revealed that the body of an unidentified female had indeed been found earlier that year in the month of April.[3] *Id.* Connelly openly detailed his story to Detective Antuna and Sergeant Thomas Haney, and readily agreed to take the officers to the scene of the crime. *Id.* Under Connelly's sole direction, the two officers were directed to the exact location of the murder. *Id.* at 161. Throughout that day, Detective Antuna perceived no indication that Connelly was suffering from any kind of mental illness. *Id.*

Connelly was held overnight. During an interview with the public defender's office the following morning, he became visibly disoriented. *Id.* He began giving confused answers to questions, and for the first time, stated that "voices" had told him to come to Denver and that he had followed the directions of these voices in confessing. *Id.* Connelly was sent to a state hospital for evaluation. He was initially found incompetent to assist in his own defense. *Id.* By March of the following year,[4] however, the doctors evaluating Connelly determined that he was competent to proceed to trial. *Id.*

---

[2] The previous year was 1982.
[3] That is 1983.
[4] 1984.

Case 3:21-cr-00079-DRD-MDM   Document 153   Filed 07/29/22   Page 4 of 9

*United States v. Abraham Nelson Brenes,*                                                                          Page 4
Crim. No. 21-079 (DRD-MDM)
_____

At a preliminary hearing, Connelly moved to suppress all his statements. Dr. Jeffrey Metzner, a psychiatrist employed by the state hospital, testified that Connelly was suffering from chronic schizophrenia and was in a psychotic state at least as of the day before he confessed. *Id.* Metzner's interviews with Connelly revealed that he was following the "voice of God." This voice instructed him to withdraw money from the bank, buy an airplane ticket, and fly from Boston to Denver. When he arrived at Denver, God's voice became stronger and told him to either confess to the killing or to commit suicide. Reluctantly following the command of the voices, Connelly approached Officer Anderson and confessed.

Dr. Metzner testified that, in his expert opinion, Connelly was experiencing "command hallucinations," which interfered with his "volitional abilities; that is, his ability to make free and rational choices." *Id.* On the basis of that evidence, the Colorado trial court decided that Connelly's statements must be suppressed because they were *involuntary*. *Id.* at 162. Although the court found that the police had done nothing wrong or coercive in securing respondent's confession, it determined that Connelly's illness destroyed his volition and compelled him to confess. *Id.* The trial court also found that Connelly's mental state vitiated his attempted waiver of the right to counsel and the privilege against compulsory self-incrimination. *Id.*

The Colorado Supreme Court affirmed. 702 P.2d 722 (1985). In its view, the proper test for admissibility was whether the statements were "the product of a rational intellect and a free will." *Id.* at 728. The court noted that "the absence of police coercion or duress does not foreclose a finding of involuntariness. One's capacity for rational judgment and free choice may be overborne as much by certain forms of severe mental illness as by external pressure." *Connelly*, at 162. The court also found that the very admission of the evidence in a court of law was sufficient state action to implicate the Due Process Clause of the Fourteenth Amendment to the United States

Case 3:21-cr-00079-DRD-MDM   Document 153   Filed 07/29/22   Page 5 of 9

*United States v. Abraham Nelson Brenes*,                                                                        Page 5
Crim. No. 21-079 (DRD-MDM)
_____

Constitution. The court concluded that Connelly's initial statement was not the product of a rational intellect and a free will and affirmed the trial court's decision to suppress all his statements.

Once the case came before the Supreme Court of the United States, the Court conducted a thorough analysis of the Due Process Clause of the Fourteenth Amendment and analogized the facts before it to several of its prior prominent police "overreaching" cases. More specifically, the Court in *Connelly* stated that,

> Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law. [Connelly] correctly notes that as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the "voluntariness" calculus. But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness." (Footnotes and citation omitted).

In response, Connelly cited to the cases of *Blackburn v. Alabama*, 361 U.S. 199 (1960) and *Townsend v. Sain*, 372 U.S. 293 (1963), for the proposition that the "deficient mental condition of the defendants in those cases was sufficient to render their confessions involuntary." *Id*. at 164. The Court noted, however, that Connelly's reliance on those two particular cases "ignore[d] the integral element of police overreaching" explained therein. *Id*.

In *Blackburn*, for example, the Court found that the petitioner was probably insane at the time of his confession and that *the police learned during the interrogation that he had a history of mental problems. Id*. at 164. (Emphasis added). The police then exploited this weakness with certain coercive tactics: namely "the eight-to nine-hour sustained interrogation in a

Case 3:21-cr-00079-DRD-MDM   Document 153   Filed 07/29/22   Page 6 of 9

*United States v. Abraham Nelson Brenes*, Page 6
Crim. No. 21-079 (DRD-MDM)
_____

tiny room which was upon occasion literally filled with police officers; the absence of Blackburn's friends, relatives, or legal counsel; [and] the composition of the confession by the Deputy Sheriff rather than by Blackburn." *Id.* at 165 (quoting *Blackburn*, 361 U.S., at 207–208, 80 S. Ct., at 80). These tactics, the Court noted, supported a finding that the confession was involuntary. *Connelly*, at 165.

In *Townsend*, meanwhile, a police physician had given Townsend a drug with truth-serum properties. 372 U.S., at 298–299, 83 S. Ct., at 749–750. The subsequent confession, obtained by officers *who knew that Townsend had been given drugs,* was found to be involuntary. *Connelly,* at 165. Both *Townsend* and *Blackburn* demonstrate that while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry. *Id.* Accordingly, in a situation where there is evidence that the defendant suffered from a mental condition, but there is *no* evidence to indicate that the police had any knowledge of that mental condition and *no* evidence that they exploited that mental condition in eliciting a confession from the defendant, evidence of defendant's mental condition would not be relevant. *See, also, United States v. Palmer*, 203 F.3d 55, 61-62 (1st Cir. 2000).[5]

That is precisely the situation that the Court is faced with now. The defendant alleges that he suffered from a mental condition, PTSD, on March 16, 2021, and that that condition somehow affected his ability to

---

[5] Following the rationale in *Connelly*, the First Circuit in *Palmer* concluded as follows:

> Even if Palmer, *arguendo*, was in a weakened condition because of his withdrawal symptoms, it does not necessarily follow that his post-arrest statements were involuntary. *See, United States v. Byrne*, 83 F.3d 984, 989 (8th Cir. 1996) (district court did not err in finding that defendant, after taking the drug methadone, made voluntary statement). In the context of the voluntariness of a confession, a defendant's mental state by itself and apart from its relation to official coercion never disposes of the inquiry into constitutional voluntariness. *See, Connelly*, 479 U.S. at 164, 107 S. Ct. 515.).

Case 3:21-cr-00079-DRD-MDM Document 153 Filed 07/29/22 Page 7 of 9

*United States v. Abraham Nelson Brenes,* Page 7
Crim. No. 21-079 (DRD-MDM)

knowingly and voluntarily consent to providing one or more incriminating statements to law enforcement. What the evidence does not show, however, is that law enforcement had any knowledge of defendant's mental condition when they executed the search warrant on March 16, 2021. In addition, the record is devoid of any evidence that law enforcement engaged in any conduct that was intended to take advantage of the defendant's purported diminished mental condition.

Indeed, the Court credits the uncontradicted testimony of Special Agent Ezequiel Batista wherein he denied on cross examination having had any knowledge that the defendant suffers from any mental condition, much less PTSD. The relevant testimony from the suppression hearing is as follows:

> Questioning by Counsel Carlos Sánchez la Costa:
>
> Q   Agent, before you searched Mr. Nelson's house before you interviewed him, did you investigate who Mr. Nelson Brenes was?
>
> Answers by Special Agent Ezequiel Batista:
>
> A   To a certain extent, yes.
>
> Q   Okay and you knew from what you testified that he was an Army veteran.
>
> A   Yes.
>
> Q   *You knew also that as a result of his service he had certain medical conditions.*
>
> A   *I wasn't aware of it.*
>
> Q   So you're saying – how did you investigate if he was an Army veteran? How did you do it?
>
> A   He had applied for a position in the Postal Service and had claimed Veteran's preference.
>
> Q   Okay, so you didn't go to the files of the Veterans Administration to search his record.
>
> A   We did not, sir.
>
> Q   *Okay. So, you didn't know that he suffered from anxiety?*

Case 3:21-cr-00079-DRD-MDM   Document 153   Filed 07/29/22   Page 8 of 9

*United States v. Abraham Nelson Brenes,*  Page 8
Crim. No. 21-079 (DRD-MDM)

> A   No.
>
> Q   *You did not know that he had suffered from depression?*
>
> A   No.
>
> Q   *Did you know that he suffered from Post-Traumatic Stress Disorder as a result of his service?*
>
> A   No.
>
> Q   *Okay, sir, did you know that he was hospitalized in a Psychiatric Institution in December of 2020?*
>
> A   No.
>
> Q   Based on – you testified that you have fourteen years of law enforcement experience.
>
> A   Yes.
>
> Q   Do you consider the fact that he suffered from – if he suffered from anxiety or from depression or post-traumatic stress disorder, an important factor in interviewing him?
>
> Would you consider that in your experience?
>
> A   Yes.

Transcript from December 14, 2021, Suppression Hearing ("Tr.") at 48-49. (Emphasis added).

A little later in his cross examination, Agent Batista was questioned about how the defendant acted and reacted to being interviewed by law enforcement. The relevant portion of the transcript is as follows:

> Q   It's your testimony that Mr. Nelson Brenes was not nervous.
>
> THE MAGISTRATE:   What?
>
> MR. SANCHEZ:  Was not nervous.
>
> THE WITNESS: I testified that he was as nervous as any person would be in an uncomfortable situation as his voice was shaken but he was answering my questions correctly.

Case 3:21-cr-00079-DRD-MDM   Document 153   Filed 07/29/22   Page 9 of 9

*United States v. Abraham Nelson Brenes,*  Page 9
Crim. No. 21-079 (DRD-MDM)

BY MR. SANCHEZ:

Q    Was he anxious?

A    He seemed a bit anxious if you ask me, yes.

Tr. at 64.

In sum, the Court has no evidence before it to demonstrate that law enforcement had any knowledge of defendant's purported mental health conditions prior to the execution of the search warrant on March 16, 2021. Nor does the evidence reflect any obvious signs that the defendant was suffering from any mental health condition. As such, there is no evidence on the record to show that law enforcement took advantage of defendant's purported mental health condition such that it would have vitiated his willingness to provide a statement to law enforcement. Accordingly, based on the Court's decision in *Connelly*, as well as the cases cited therein, the Court finds that there is no correlation between the defendant's purported mental health condition and any conduct of law enforcement that would vitiate the defendant's consent to provide a statement to law enforcement.

For all these reasons, the Court finds that the proffered expert testimony is irrelevant to the ongoing proceeding, and therefore **DENIES** the defendant's Motion to Appoint a Psychiatric Expert at Docket No. 124. The Court will set a date to conclude the suppression hearing by separate order.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 29th day of July 2022.

MARSHAL D. MORGAN
UNITED STATES MAGISTRATE JUDGE